Woodrow **ALLMAN** et al., Plaintiffs,

v.

**JAMES HEALING COMPANY,** a Corporation of the State of New Jersey, Defendant.

Civ. A. 9925.

United States District Court
D. New Jersey.

June 29, 1956.

**674**

Samuel M. Cole, Jersey City, N. J., Nathan Baker, Hoboken, N. J., for plaintiffs.

Milton, McNulty & Augelli, by Joseph Keane, and William E. Bannon, Jersey City, N. J. George J. Rossi, Asst. U. S. Atty., Jersey City, N. J., Paul A. Crouch, New York City, of counsel, for defendant.

FORMAN, Chief Judge.

The plaintiffs remaining in this case are New York longshoremen who, during World War II and shortly thereafter, worked as ammunition loaders for the defendant James Healing Company, a New Jersey corporation engaged in the stevedoring business. They brought this suit on March 26, 1947 claiming back pay under a series of collective bargaining contracts entered into in 1941, 1943, and 1945 by the International Longshoremen's Association, their union and bargaining representative, and the New York Shipping Association, bargaining representative for the stevedoring firms in the New York area.[1]

Under these three collective bargaining agreements the men were to be paid for time spent in traveling to the place of their labors when that site was removed from the ordinary place of employment. All parties agree that travel time pay was provided for in the contracts. The specific issue here concerns the rate of such pay. It is the contention of the plaintiffs that when men were traveling by any means whatever to a site where their work was to be the loading of explosives, they were to be paid for such traveling time at a higher rate of pay called the ammunition or explosives rate. These rates were under the 1941 contract $2.40 per hour for regular time and $3.60 per hour for overtime; under the 1943 contract $2.50 per hour for regular time and $3.75 per hour for overtime; and under the 1945 contract $3.00 per hour for regular time and $4.50 per hour for overtime. These rates were the rates paid to the men for time spent in the actual handling of explosives.

The contracts provided for premium rates for the handling of specific types of cargo, with loading of explosives compensated for at the highest rate. The lowest rate was called the general cargo

1. There are eight cases other than this one pending before this court involving, among others, the identical issues resolved herein. Originally, these actions had New Jersey as well as New York residents as plaintiffs. However, since diversity of citizenship is the only justifiable basis for jurisdiction in this court, the complaints were dismissed as to the New Jersey residents concerning the issues discussed in this opinion.

It was stipulated by the parties at the pretrial conference that the result reached in this case is to control disposition of these same issues in the eight other pending cases. (See minutes of pretrial conference of January 5, 1956.) Those eight cases are:

| | | |
|---|---|---|
| 1. | Albano, et al. v. James Healing Co. | Civil 10589 |
| 2. | Allen, et al. v. Water Front Co. | Civil 10599 |
| 3. | Abbattista, et al. v. James Healing Co. | Civil 10600 |
| 4. | Adair, et al. v. James Healing Co. | Civil 10848 |
| 5. | Anderson, et al. v. James Healing Co. | Civil 10852 |
| 6. | Allegretti, et al. v. No. Atlantic S. S. Co. | Civil 10920 |
| 7. | Ahearn, et al. v. James Healing Co. | Civil 209–49 |
| 8. | Zurich, et al. v. James Healing Co. | Civil 535–51 |

rate. It was the basic general rate and higher rates for handling of specific material were exceptions to the general cargo rate. Under the 1941 contract the general cargo rate was $1.20 for regular time and $1.80 for overtime; under the 1943 contract it was $1.25 for regular time and $1.87½ for overtime; and under the 1945 contract it was $1.50 for regular time and $2.25 for overtime. It

\* \* \*

should be noted that the regular and overtime explosives rates were always double the corresponding general cargo rates. The following wage scale for explosives is taken from the 1941 contract. The provisions in the 1943 and 1945 contracts are identical except, of course, for the increase in rates:

"4. Wage Scale: The Wage Scale Shall be as Follows:

| | "Straight Time Hourly Rate | Overtime Hourly Rate |
|---|---|---|
| "(g) Explosives ......................... | $2.40 | $3.60 |

"(i) When handled down the Bay, the time shall start from the time men leave the pier until the time they return to pier.

"(ii) When handled down the Bay, men shall supply their own meals, but $1.00 per meal shall be allowed by the employer.

"(iii) When explosives, such as are customarily handled down the Bay, are handled at any pier, men shall be paid at the explosives rate of pay.

"(iv) Any dispute as to what explosives are, shall be settled by the Bureau of Explosives whose decision shall be final and shall be accepted by both sides."

It is apparent that this provision of the contract contemplated that whenever men handled explosives they were to be paid at the explosives rate, no matter at what location such handling took place. Both plaintiffs and defendant understood this to be so and defendant paid according to this interpretation. It is also clear that when explosives were to be handled "down the Bay" the working time during which the men were to be paid at the explosives rate was to be computed from the time they left the pier until the hour they returned to the pier. Handling explosives "down the Bay" meant that the men would load a ship anchored in New York Bay with explosives obtained from barges towed to the ship. Such loading was not done at regular piers or docks but was done "down the Bay" as a safety precaution. In this event the men would meet or "shape" at a designated pier usually in Jersey City and would be transported from that pier to the ship which was to be loaded and when through would be brought back again. They were paid at the explosives rate from the moment they stepped aboard a launch or other water conveyance in order to be transported from the pier to the ship "down the Bay" to the moment they stepped off the launch and back onto the pier at the end of their day's work. If designated overtime hours were encompassed by this span of combined traveling and working time, those hours were paid for at the explosives overtime rate. It is conceded that the defendant paid according to this

interpretation of clause 4(g) (i) above whenever explosives were handled "down the Bay".

There were, however, other locations at which explosives were loaded. If these locations were removed from normal working or "shaping" areas the men would be compensated for the time spent in traveling to the work location. In some cases the defendant would supply such transportation. At other times public conveyances would be used in which event the men would be given bus or train fare as well as payment for the time spent in riding to and from the work location.

The 1941 and 1943 contracts contained identical provisions concerning this travel time. Paragraph 17 of both contracts provided:

"17. When men are specifically ordered out from New York or Brooklyn to work on the North and East Rivers above 75th Street, or on piers at Weehawken, Communipaw or West New York, carfare in excess of that spent in traveling to their usual place of employment shall be allowed.

"Men specifically ordered out from New York or Brooklyn to work at Claremont, Edgewater or Astoria shall receive the equivalent of one hour's pay at the *prevailing day rate*, plus cost of transportation, and at Yonkers, Bayonne, Carteret, Chrome, Port Newark, Greenville (Lehigh Valley Claremont Terminal) or Bayway shall receive the equivalent of two hours' pay at the *prevailing day rate*, plus cost of transportation.

"Men specifically ordered out from Jersey City or Hoboken to work at Claremont, Edgewater, Bayonne, Port Newark, Greenville (Lehigh Valley Claremont Terminal) or Astoria shall receive the equivalent of one hour's pay at the *prevailing day rate*, plus cost of transportation, and at Yonkers, Carteret, Chrome or Bayway shall receive the equivalent of two hours' pay at the *prevailing day rate*, plus cost of transportation." (Italics supplied).

The 1945 contract contained substantially identical provisions concerning travel time:

"18. (a) When men are specifically ordered out from New York, Brooklyn, Hoboken or Jersey City, to work on the North and East River Piers above 75th Street, and when men are specifically ordered out from New York or Brooklyn to piers at Weehawken, Communipaw or West New York, carfare in excess of that spent in traveling to their usual place of employment shall be allowed.

"(b) Men specifically ordered out from New York or Brooklyn to work at Claremont, Edgewater or Astoria shall receive the equivalent of one hour's pay at the *prevailing day rate*, plus cost of transportation, and at Yonkers, Bayonne, Carteret, Chrome, Port Newark, Greenville (Lehigh Valley Claremont Terminal) or Bayway shall receive the equivalent of two hours' pay at the *prevailing day rate*, plus cost of transportation.

"(c) Men specifically ordered out from Jersey City or Hoboken to work at Claremont, Edgewater, Bayonne, Port Newark, Greenville (Lehigh Valley Claremont Terminal) or Astoria shall receive the equivalent of one hour's pay at the *prevailing day rate*, plus cost of transportation, and at Yonkers, Carteret, Chrome or Bayway shall receive the equivalent of two hours' pay at the *prevailing day rate*, plus cost of transportation.

"(d) When men are specifically ordered out from New York, Brooklyn, Hoboken or Jersey City to Leonardo they shall receive the equivalent of three hours' pay at the *prevailing day rate*, plus the cost of transportation, unless transportation is provided by the employer." (Italics supplied).

There is no question that the plaintiffs were paid for their travel time. How-

ever, the plaintiffs contend that the contract properly construed required the defendant to pay them for travel time at the explosives rate of pay whenever they were to be compensated for time spent traveling to and from a location where explosives were handled. It will be seen from the above excerpts from the three contracts in suit that travel time was to be paid at the "prevailing day rate" of pay. It is plaintiffs' theory that those words mean that the pay for travel time was to be at the same rate that *prevailed* for the actual work done at the destination reached by travel during the hours for which travel time was to be paid. That would mean that when the men were paid for traveling to a destination at which they were to load explosives such travel time was to be paid for at the explosives rate. It is that rate plaintiffs say was the "prevailing day rate".

The defendant's position is that the words "prevailing day rate" refer to the general cargo rate, on the theory that that was the generally *prevailing* rate of pay throughout the industry in the New York area. It was this construction of the terms "prevailing day rate" by which the defendant abided, and consequently paid for travel time at the general cargo rate. The plaintiffs demand as damages the difference between what they received for travel time at the general cargo rate and what they say they should have received by computing their pay for travel time at the explosives rate.

Since the exact meaning of the clause in dispute was obscure, the plaintiffs were permitted to produce testimony designed to dissolve the ambiguities inherent in the words. Plaintiffs' specific claim was that they could prove (1) a long-standing industry practice of paying for travel time at the rate paid for the time worked after the destination was reached, and (2) that the defendant began performance under the 1941 contract by paying plaintiffs for travel time at the explosives rate but then breached in early 1942 by reducing the plaintiffs' travel time to the general cargo rate.

Plaintiffs were unable to show the industry practice they claimed existed. That should not be considered unusual since the alleged practice was one said to have existed more than 15 years ago and since at that time there was comparatively little explosives loading in the New York area. It was testified that there was very little or no explosives loading except "down the Bay" prior to 1941.

The testimony also showed that plaintiff's allegation that defendant first began performance under the 1941 contract in accordance with their interpretation of "prevailing day rate" confused hours allowed for traveling with the rate paid for those hours. The testimony of defendant's witnesses is unequivocal that the explosives rate was never paid for travel time except in the specifically provided for instance when explosives were loaded "down the Bay". The actual source of the belief of the plaintiffs that they were once paid for travel time at the explosives rate is difficult to derive from this record. There are, however, some plausible explanations. It was testified that the explosives loaded "down the Bay" came into South Amboy by railroad and were loaded there onto barges which were then towed out to ships anchored in the bay where the explosives were transferred to the ships. Sometimes the men were sent to South Amboy in order to accompany the barges to the ship at anchor because of a shortage of available water transportation from their normal "shaping" point to the ship "down the Bay". For travel time to South Amboy the men would be allowed two hours at the general cargo rate. It is indicated in the record that these two hours at the general cargo rate may have been confused with one hour at the explosives rate which was exactly double the general cargo rate.

It is also possible that the plaintiffs may have confused the specific provision for the computation of working time when ships were to be loaded "down the Bay" with what they thought the con-

tract provided for computation of travel time as a general rule. But, as has been outlined above, time spent by the men traveling over water to a ship "down the Bay" was contractually provided to be paid for as working time rather than travel time.

There is still a further possibility as to the source of plaintiffs' confusion. In 1944 the government began loading ammunition at a newly constructed pier at Leonardo, New Jersey, a small town in Monmouth County on the shore of Sandy Hook Bay. The 1943 contract under which the parties were then operating did not provide for the number of hours travel time to be allowed for riding back and forth to Leonardo as it did for other points where men might be ordered to work. (See excerpts from contracts set forth supra). Defendant determined to allow four hours' travel time to and from Leonardo and for some time paid travel time to Leonardo on a four hour basis.

Later, at the behest of the government, which had contracts with the defendant for the loading of ammunition, and which was ultimately liable for defendant's payroll, the amount of travel time allowed for work at Leonardo was cut to two hours. At this the men protested. The matter was subsequently submitted to arbitration and it was then decided that three hours' pay was fair for travel to and from Leonardo and this amount of travel time was subsequently incorporated in the 1945 contract. However, it appears that when the men were receiving four hours' pay for travel to Leonardo at the general cargo rate they were satisfied. That was the equivalent of two hours' pay at the explosives rate and when the time was cut the men mistakenly assumed that instead the rate had been reduced. In any event, the court accepts the statements of defendant's witnesses that there never was a practice of paying for travel time to and from the loading of explosives at the explosives rate, but that on the other hand such travel time was consistently compensated at the general cargo rate.

Defendant emphasizes what it calls the "practical" construction of these contracts under which the parties operated. That "practical" construction is said to have been based upon the realization that the higher ammunition rate of pay was compensation for the increased danger assumed in handling explosives and as a "practical" matter it was contemplated that the higher rate would be paid only when there was actual submission to that danger. This seems to have been the common sense understanding of the contract. It might also be pointed out that when it was desired that the men be paid at the explosives rate for riding to work "down the Bay" such was explicitly and unequivocally provided for in the contract.

The plaintiffs also insist that they are entitled to the higher rate for travel time because they were "experts" in ammunition and explosives handling. The claim that they were "experts" is based on the fact that they had to take a Coast Guard test in order to qualify for such work. The tests, however, only went so far as to check their loyalty, see that they were literate enough to read the labels on the explosives containers, and to see that they had no police record. Being able to pass these tests hardly endows them with special skills sufficient to support the substantial increase of pay which is claimed.

■ Defendant has pointed out that to interpret "prevailing day rate" as a reference to the general cargo rate is consistent with the use of the term "prevailing rate" in other portions of the contracts. Such is the interpretation that the plaintiffs, in order to succeed, must prove erroneous. That burden has not been discharged. Consequently, it must be concluded that the plaintiffs have already been fully compensated for their travel time in accordance with the terms of the three collective bargaining agreements in suit.

■ Defendant also put in issue the plaintiffs' ability to meet the required jurisdictional amount of $3,000 in diver-

sity cases. 28 U.S.C. § 1332. Once a plaintiff's ability to prove jurisdictional amount is challenged, he must prove that jurisdictional requirement by a preponderance of the evidence. McNutt v. General Motors Acceptance Corp., 1936, 298 U.S. 178, 56 S.Ct. 780, 80 L.Ed. 1135. However, the jurisdictional requirement is satisfied by proof of a good faith demand in excess of $3,000.

"The rule governing dismissal for want of jurisdiction in cases brought in the federal court is that, unless the law gives a different rule, the sum claimed by the plaintiff controls if the claim is apparently made in good faith. It must appear to a legal certainty that the claim is really for less than the jurisdictional amount to justify dismissal." St. Paul Mercury Indemnity Co. v. Red Cab Co., 1938, 303 U.S. 283, 288–289, 58 S.Ct. 586, 590, 82 L.Ed. 845.

Toward the end of the trial in this case plaintiffs produced an accountant's expert analysis of the records of one, Edward O'Connell, a longshoreman. The accountant's conclusions as to the amount due O'Connell under one of the plaintiffs' theories exceeded $3,000 and under another theory was slightly less than that amount. This issue is further complicated by the belated discovery at the very end of the case that O'Connell is not a party to this suit. However, O'Connell had testified for the plaintiffs as an expert on the liability phase of the case and it is inferable that the extent of his work in loading explosives is fairly representative of that of most of the men so engaged in the same activity from 1941 through 1947. Plaintiffs have a right to press their most optimistic theory of recovery. The proofs did not show that a claim in excess of $3,000 on behalf of each of the plaintiffs was so hopelessly exaggerated as to imply bad faith. On the contrary, based upon the analysis of the O'Connell records by plaintiffs' expert, plaintiffs were fully justified in their contention that jurisdictional amount was present.

Judgment will be entered for the defendant upon the submission of an appropriate order to that effect by counsel for the defendant, consented to as to form only by counsel for the plaintiffs, or notice should be given for the settlement of such an order.